# United States Court of Appeals
## For the First Circuit

No. 05-2015

CHARLES J. SENIOR; NORMAN FAHY; RONALD D. PHIPPS; RAYMOND W. POSTMA; THOMAS G. HIRL; GARRETT M. FAGAN; UNITED STEELWORKERS OF AMERICA, LOCAL 12004,

Plaintiffs, Appellants,

v.

NSTAR ELECTRIC AND GAS CORPORATION; COMMONWEALTH GAS COMPANY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, Senior U.S. District Judge]

Before

Selya, Lynch, and Lipez,
Circuit Judges.

Abigail V. Carter, with whom John M. West and Bredhoff & Kaiser, P.L.L.C. were on brief, for appellants.
Keith B. Muntyan, with whom Robert P. Morris and Morgan, Brown & Joy were on brief, for appellees.

May 31, 2006

**LYNCH**, **Circuit Judge**.  The question presented is whether former utility company employees who took advantage of early retirement programs are entitled by reason of a labor agreement to vested lifetime dental benefits that could not be changed by the company.  Such dental benefits are not given to other former employees or to present employees.  These benefits are welfare benefit plan benefits under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461.  "Welfare benefit plans" -- plans that provide "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment," id. § 1002(1) -- are not subject to the strict vesting requirements of ERISA pension benefit plans.  Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995).  Employers are "generally free . . . for any reason at any time, to adopt, modify, or terminate welfare plans."  Id.

Employers may provide retirees with vested retiree welfare benefits by contract or otherwise.  "[U]nder both section 301 [of the Labor Management and Relations Act (LMRA)] and ERISA, if an employer promises vested benefits, that promise will be enforced."  Am. Fed'n of Grain Millers v. Int'l Multifoods Corp., 116 F.3d 976, 980 (2d Cir. 1997).  The issue, then, is whether the labor agreements here provided for vested lifetime dental plan benefits that could not be changed by the company.  The standard by

-2-

which this question is evaluated is one of first impression in this court.

Retired union employees of Commonwealth Gas Company and their union, the United Steelworkers of America, Local #12004, filed suit against the retirees' former employer and its successor, NSTAR Electric & Gas Corporation. The plaintiffs took advantage of one of two early retirement programs offered by the company, one in 1997 and one in 1999. These early retirement programs ("ERPs") were negotiated between the company and the union, and the negotiated terms were memorialized in two memoranda of agreement (the "ERP agreements"). These ERP agreements are enforceable under § 301 of the LMRA, 29 U.S.C. § 185(a).

The ERPs offered retirees continuing health and dental benefits, in line with the benefits that had been given to retirees by the company before the ERPs. In late 2002, the company announced a number of changes, including the change that company-paid dental benefits for all retirees ceased once the retiree reached sixty-five years of age, unless the retiree had already reached that age as of April 1, 2003.

The plaintiffs brought suit, alleging that the decision to cease reimbursement of their Medicare Part B premiums and dental plan coverage violated, inter alia, § 301 of the LMRA, 29 U.S.C. § 185(a), and § 502(a)(1) of ERISA, id. § 1132(a)(1)(b), because,

in their view, the decision was contrary to the ERPs which were part of the 1997 and 1999 ERP agreements.

The district court granted the company's motion for summary judgment on all counts. See Senior v. NSTAR Elec. & Gas Corp., 372 F. Supp. 2d 159, 168 (D. Mass. 2005). Although plaintiffs originally styled their case as raising claims both under ERISA and § 301, their claims, as reframed on appeal, are in fact dependent upon an interpretation of the labor agreements and otherwise state no independent ERISA claim.[1] We analyze the case under § 301 of the LMRA.

We affirm, though on different grounds than those relied on by the district court.

I.

We recount the facts, taking all reasonable inferences in favor of the plaintiffs, the non-moving parties, as is done on summary judgment motions. See Douglas v. York County, 433 F.3d 143, 145 (1st Cir. 2005). The basic facts are not in dispute. To understand the dispute about the benefits provided for in the 1997 and 1999 ERPs at issue here, one needs to understand the status of those benefits before adoption of the ERPs.

---

[1] Only the union and retirees who took advantage of the ERPs remain parties to this appeal. Charles J. Senior (now deceased) and Garrett M. Fagan retired in 1980 and 1993, respectively, before the ERPs were in place. Norman Fahy and Ronald D. Phipps retired under the 1997 ERP, and Thomas G. Hirl and Raymond W. Postma retired under the 1999 ERP.

A.        Retiree Dental Benefits Predating the ERPs

          1.        Retiree Dental Benefits Prior to April 1, 1993

From April 1, 1973 to April 1, 1993, the collective bargaining agreements ("CBAs") between the company and the union provided dental benefits for current employees; the CBAs specified a particular dental plan and incorporated the terms and conditions of that plan. The CBAs did not, however, explicitly provide dental benefits for retirees. Still, the record reveals that union employees of Commonwealth Gas were given dental benefits upon retirement during this period.

The plaintiffs put into evidence personalized retirement benefits summaries, prepared by the company's benefits coordinator, which were given to union employees who retired before 1993 (and who are not plaintiffs here). These summaries described expected benefits, including pension payments, the employee savings plan, disability benefits, and life, medical, and dental insurance. One such summary given to an employee who retired in 1975 stated, as to dental coverage, in full: "Your Dental Plan coverage will continue for you, your spouse and your dependent children." The summary also contained references to plan documents: "In all cases, the exact provision of the various Benefit Contracts and applicable laws will determine the benefits to be paid thereunder."

Similar retirement benefits summaries were given to employees retiring in 1979, 1980, 1982, 1990, and 1991,[2] and contained nearly identical language concerning continued dental plan coverage[3] and identical references to plan documents.

2.    Retiree Dental Benefits After April 1, 1993

The 1993 CBA (covering the period from April 1, 1993 to April 1, 1996), like the agreements predating it, did not explicitly address retiree dental benefits, but provided for dental benefits for "[e]ligible employees": "Eligible employees, and their eligible spouses and dependents, will be covered under the terms and conditions of Dental Service of Massachusetts, Inc., DPP II, as amended, the provisions of which are made a part of this contract."

However, on April 13, 1993, the 1993 CBA was amended, effective April 1, 1993, to provide with respect to dental benefits for qualified employees who retired after April 1, 1993:

---

[2] An earlier handwritten draft summary of benefits given to the employee who retired in 1991 described the dental benefits as "[c]overage for life" and provided: "In the event of your death, your wife will remain covered for one year." This draft also contained the following disclaimer: "NOTE: NOT AUDITED AND SUBJECT TO CORRECTION."  This employee received a subsequent personalized benefits summary in line with the other summaries described.

[3] These documents state: "Your Dental Plan coverage will continue for you, your spouse and dependent children whether or not you retire at age 65."

DENTAL PLAN

Benefits After Retirement or Termination

> If you were age 40 or over with 12 or more years of service as of January 1, 1993 and subsequently retire or terminate with the "Rule of 75"[4] (with the System Companies) you WILL BE eligible for the COM/Energy sponsored Delta Dental Plan. If you retire or terminate prior to age 62, you will pay 10% of dental premiums in effect as of January 1, of the year in which you terminate or retire. When you reach age 62, COM/Energy will pay your entire premium.

This amendment did not change retiree benefits, but only clarified the eligibility requirements for benefits, at least with respect to employees covered by the contract.[5] The dental benefits provided in the 1997 and 1999 ERPs closely mirrored the dental benefits already provided to union retirees via the amendment to the 1993 CBA.

The personalized summaries given after April 1, 1993 to retiring employees reflected the new agreement. One such document given to a union employee retiring in 1995, entitled "Information Relative to Employee Benefits Upon Your Retirement Date," stated, for covered retirees meeting the threshold requirements: "Your Dental Plan coverage will continue for you, your spouse and

---

[4] In the amendment to the 1993 CBA, the "Rule of 75" was defined as the age of the employee plus the years of service.

[5] The company provided no dental benefits for retiring employees not meeting the age and length of service requirements as of January 1, 1993.

eligible dependents," and "you will pay 10% of the current premium (January 1, premium at retirement) from age 55 to age 62. When you reach age 62, the Company will pay the entire premium." The summary also contained the same reference to plan documents as earlier personalized retirement benefits summaries: "In all cases, the exact provisions of the various Benefit Contracts and applicable laws will determine the benefits to be paid thereunder."

The 1996 CBA (covering April 1, 1996 to April 1, 2002)[6] again does not make explicit reference to the eligibility requirements for retiree benefits, providing only that "[e]ligible employees, and their eligible spouses and dependents, will be covered under the terms and conditions of Dental Service of Massachusetts, Inc., DPP II, as amended, the provisions of which are made a part of this contract." However, the plaintiffs, in response to interrogatories, admitted that the 1996 CBA did not change the retiree benefits established by the amendment to the 1993 CBA.

Indeed, with respect to dental benefits, a personalized retirement benefits summary given to an employee who retired on July 1, 1996 (after the effective date of the 1996 CBA) contained language identical to the 1995 personalized benefits summary described above. It appears that under the 1996 CBA, retirees were

---

[6] All plaintiffs retired during the period this CBA was in effect.

-8-

eligible for dental benefits to the same extent as provided in the amendment to the 1993 CBA.

This sets the stage for the dispute about the ERP benefits.

B.      Dental Plan Documents

Again, we give the background, working up to the time of the ERPs.  Much of the dispute here relates to the documents governing retiree dental plans, and the extent to which we must look to these documents when interpreting the 1997 and 1999 ERP agreements.

It is undisputed that the dental plan contracts during all relevant times reserved the right of the company to amend, modify, or terminate the applicable dental plan (although the plaintiffs point out that at times these reservations are made subject to applicable collective bargaining agreements).[7]  The documentary evidence on record supports this conclusion.[8]  Three

---

[7] The record is unclear as to which plans applied to which employees and retirees, and when the underlying dental plan documents were in effect, during the relevant times in this case. Indeed, the company's own benefits coordinator, in deposition testimony, expressed considerable confusion about the dates the various benefits plans were in effect.

[8] The company put into evidence excerpts from two company documents, dated January 1, 1993, entitled "Post Retirement Benefit Program-Group I" and "Post Retirement Benefit Program-Group II." The company points to an identical reservation clause in both documents. In part, that clause states: "Subject to the provisions of Section 8.03 of Part I hereof, the Company, through the Plan Administrator, may terminate the Program or discontinue Benefits hereunder at any time upon written notice to the affected Trustee

key points are not in dispute: that such plan documents were explicitly incorporated into the 1993 and 1996 CBAs, that the plaintiffs here received the plan documents, and that the separate memoranda of agreement which created the ERPs in 1997 and 1999 do not contain an explicit reference to plan documents.

The company periodically distributed summary plan descriptions (SPDs) for the dental plans to all employees; these are, in part, the "plan contracts" or "plan documents" referred to in the CBAs and other documents. One such SPD, for the "Dental Protection Plan II" offered by Delta Dental Plan, contains a revision date of June 1991.[9] As to termination, the SPD provides:

and/or Insurer."

The import of these documents is not entirely clear. The plaintiffs and the company agree that the documents are related to the creation of a funding mechanism for the company's retirement obligations. The plaintiffs argue that the reservation clauses in these documents only reserved the right to terminate the funding mechanism for the retirement benefit plans, not the plans themselves. The plaintiffs point to deposition testimony of company managers that these documents were not given to employees, although they also cite to these documents and describe them as an excerpt from the "Employee Benefit Handbook." The company for its part describes these documents as "underlying plan documents" that are somehow controlling but does not make an effort to demonstrate how these documents are tied to the collective bargaining agreements.

In any event, the company has failed to provide a sufficient evidentiary basis for us to rely on these documents. It put into the record only a single page from the documents, containing the reserved right of termination, and did not put into the record "Section 8.03 of Part I," to which the reserved rights of termination are subject.

[9] This SPD also states that "[t]he information contained herein is updated through April 1, 1990." It is unclear how the various dates on this and other SPDs relate to the period that the

"Your plan sponsor may cancel your contract for any reason." In a section titled "Rights," that SPD also provides: "Although Commonwealth Energy System and Subsidiary Companies intends to continue this plan indefinitely, it reserves the right to amend any provisions or terminate the plan at any time."

Another SPD (with a revision date of January 1994) for the "DeltaPremier II" plan, also offered by Delta Dental Plan of Massachusetts, similarly provides for the company's unrestrained right to terminate the plan: "Your plan sponsor may cancel your contract for any reason. To do so, your plan sponsor must give us notice in writing at least 30 days prior to the termination date."[10]

An SPD issued in 1996 as part of an "Employee Benefits Handbook" stated, at the end of the section describing the "DeltaPremier II Plan," under the heading "Your Rights":

> This section of the Handbook describes the DeltaPremier II Plan in general. If any conflict arises between this Summary Plan Description and the Plan contract, or if any point is not covered, the terms of the Plan contract will always govern.

---

SPDs were in effect. It is conceivable, and in one case, relatively clear, that the documents were used long after being revised or updated.

[10] The "Delta Protection Plan II" and the "DeltaPremier II" appear to be the plans referred to in the 1993 and 1996 CBAs. The CBAs refer to "Dental Service of Massachusetts, Inc., DPP II." As SPDs for both plans explain, the Dental Service of Massachusetts, Inc. was doing business as Delta Dental Plan, and at the bottom of the cover pages of the SPDs there is the notation "DPP II."

> The company reserves the right, subject to the provisions of any collective bargaining agreement, to amend, modify or terminate the Plan at any time.

Similar language appeared at the end of another SPD for the "Dental Blue Program 2" issued as part of the same handbook. In both these SPDs, the reserved rights of the company are constrained by the "provisions of any collective bargaining agreement."

In February 1997, the company sent to employees a package of updated SPDs. This package included an SPD (with a revision date of September 1, 1993) for the "Dental Blue Program 2" offered by Blue Cross and Blue Shield of Massachusetts. It contains an unconditional right to termination: "Your Plan Sponsor may terminate your contract for any reason." But the document also contains language, under the heading "Your Rights," substantially similar to the language under that same heading quoted from the 1996 SPD, making the reserved rights "subject to the provisions of any collective bargaining agreement."[11] Fahy and Phipps received these SPDs after they elected to participate in the 1997 ERP.[12]

---

[11] The record does not tell us whether the 1996 SPDs contained termination language allowing the plan sponsor to "terminate [the] contract for any reason", in addition to the "Your Rights" language reserving the right "subject to the provisions of any collective bargaining agreement, to amend, modify or terminate the Plan at any time." The record contains only an excerpt of the 1996 SPDs that contains the "Your Rights" language.

[12] The "Dental Blue Program 2" appears to have covered two of the plaintiffs during some period of time. In their brief, the plaintiffs state that "the Dental Blue Program II . . . from 1994 through December 31, 1999, covered retirees of COM/Energy and its

-12-

C.      The Early Retirement Programs

        1.      1997 Personnel Reduction Program

        In 1997, after Commonwealth Gas and Commonwealth Electric merged, the new entity, COM/Energy, established an ERP for non-unionized company employees called the Personnel Reduction Program ("PRP"). The company also entered into negotiations with Local #12004 to allow the union employees to take advantage of the PRP. These negotiations resulted in a memorandum of agreement, effective May 13, 1997. The agreement specified that employees taking advantage of the PRP would receive a severance payment, educational and outplacement assistance, and group life insurance. The agreement provided:

>    Health/Dental Insurance Coverage:
>    . . . .
>
>    Employees who were at least age forty (40) and had completed at least twelve (12) full years of System service as of January 1, 1993 and currently meet the "Rule of 75" will be entitled to medical and dental insurance coverage providing they pay ten percent (10%) of the current medical and dental premium until age sixty-two (62). At age 62, the Company will pay 100% of the premium.

Thus, this ERP agreement provided the retirement benefits to certain long-term union retirees, as plaintiffs here were, on the

predecessors and successors, including the plaintiffs." Plaintiffs Fahy and Phipps both retired on November 1, 1997; plaintiffs Hirl and Postma retired on April 1 and March 1 of 2000, respectively.

same terms as had been provided to retirees since April 1, 1993.[13] It also preserved the date against which one aspect of eligibility was to be measured, so that only employees who had met the age and length of service requirements as of January 1, 1993, and then retired after meeting the Rule of 75, could receive the dental benefits described.  This latter provision insured that the PRP, on this issue, would not provide greater benefits than available earlier.  There is nothing in the bargaining history for this ERP agreement showing that the company and the union had agreed to increase the dental benefits for employees retiring under the PRP, and make them vested and unchangeable.

The company gave to both union and non-union employees a brochure entitled "Personnel Reduction Program: Information for Commonwealth Energy System and Subsidiary Companies Employees" in 1997.  The brochure contained information about the benefits available via the Personnel Reduction Program.  The brochure describes dental benefits in language identical to that found in the memorandum of agreement; these same benefits terms also applied to non-union employees.  The brochure, however, also pointed employees to the plan documents and said that in case of conflict, the plan documents prevailed:

> This summary is not intended to offer detailed
> descriptions of the System's employee benefit

---

[13] The PRP provided short-term dental plan coverage for employees not meeting the eligibility requirements.

plans. All information furnished is governed by the provisions of the actual plan documents pertaining to the appropriate benefit plans. If any conflict arises between this summary and the System's employee benefit plan documents, or if any point is not covered, the terms of the appropriate plan documents will govern in all cases.

The plan documents, in turn, contained the reservation of the company's right to modify or terminate the plan.

Plaintiffs support their argument that the agreement granted vested lifetime benefits that could not be changed with two sets of items in evidence. The first are oral statements. Fahy and Phipps expressed interest in the PRP and met with the company's human resources personnel on several occasions. At these meetings, Fahy and Phipps were told that the benefits were lifetime benefits. They were not told this could be revised at any time.

Further, in October of 1997, Fahy and Phipps were each given a personalized document entitled "Information Relative to Employee Benefits Upon Your Retirement Date," similar to the personalized retirement benefits summaries given to retirees before the PRP. As to dental insurance, for both Fahy and Phipps the summary provided:

> Since you were age 40 and had 12 or more years of employment as of January 1, 1993, you will be covered by the Company sponsored dental plan at your Actual Retirement Date.
>
> You will pay 10% of the current premium (the premium in effect as of the first of the year in which you retire) from age 55 to age 62.

-15-

> When you reach age 62, the Company will pay the entire premium.
>
> Coverage for your spouse and/or eligible dependents will be provided.
>
> <u>Your dental coverage will be for your life.</u> Your spouse and/or eligible dependents will be covered for 12 months after your death. . . .

(emphasis added). These personalized documents differed from earlier such documents in that they stated that "dental coverage will be for your life" and that the retiree's spouse and dependents would receive benefits for a period after the retiree's death. The earlier personalized documents had provided only that the retirees dental benefits would "continue." Nonetheless, the personalized documents given to Fahy and Phipps also provided the same reference to the plan documents as the PRP brochure, i.e., that "the terms of the appropriate plan documents will govern in all cases."

Fahy and Phipps later received a series of SPDs, including the SPD for the dental plan (Dental Blue Plan). These plan documents contained reservation of rights language. This was not the first time these plaintiffs had received the SPDs; rather, SPDs for all the benefit plans were distributed periodically to all employees.

2.    <u>1999 Voluntary Separation Program</u>

In 1999, COM/Energy merged with BEC Energy (the parent company of Boston Edison) and formed a new holding company, NSTAR. As part of this merger, the company created another ERP for

employees, the Voluntary Separation Program ("VSP"). Negotiations between the company and the union resulted in another memorandum of agreement, effective August 4, 1999, allowing union employees to take advantage of the VSP. The memorandum of agreement provided that "the Company will offer the following Voluntary Separation Program (VSP) to all employees that are members of the United Steelworkers of America, Local #12004." At least with respect to health and dental benefits, the 1999 VSP agreement was identical to the 1997 PRP agreement (with the exception of a slight difference in COBRA payments for retirees who did not meet the age and length of service requirements). It too preserved the January 1, 1993 date against which one aspect of eligibility for the dental benefits at issue here was to be measured. Like with the 1997 ERP agreement, there is nothing in the bargaining history for the 1999 ERP agreement to suggest that the parties intended to provide unchangeable lifetime dental benefits to employees taking advantage of the VSP.

Two versions of a "Program Summary" describing the VSP were given to employees, one for employees represented by certain unions (including Local #12004) and one for all other employees (including all non-union employees). Neither version contained the particulars of the post-retirement dental benefits. They stated that "[i]f you are eligible for post-retirement medical, dental and live insurance coverages, you will receive information from Human

-17-

Resources-Benefits at the time of your termination." Both versions stated that "[i]f any conflict arises between this summary and either the Company's employee benefit plan documents or the Agreement and General Release, or if any point is not covered, then the terms of the appropriate plan documents or Agreement and General Release, as appropriate, will govern in all cases."

However, the version of the program summary that was distributed to non-union employees, in contrast to the union employees, contained the following statement: "The Company reserves the right to change or terminate coverage for current and former employees at any time. Any such change may be in the benefits provided, the contributions required, or in any other aspect in accordance with applicable laws." Hirl and Postma point to the lack of such a statement in the version of the VSP program summary given them as evidence that, as to members of Local #12004, the company intended the benefits to be unconditionally perpetual.

Plaintiffs Hirl and Postma expressed interest in the VSP and met with company representatives. At these meetings, Postma was told that his dental benefits would continue for as long as he lived and Hirl was told that nothing in the contract could be changed. Hirl and Postma each received individualized retirement summaries; these summaries are identical to the personalized summaries given to plaintiffs Fahy and Phipps under the 1997 PRP as to the description of dental coverage ("Your coverage will be for

-18-

your life.") and the reference to plan documents ("All information furnished is governed by the provisions of the actual plan documents pertaining to the appropriate benefit plans.").

The plaintiffs do not dispute that SPDs were periodically distributed to all employees, and do not suggest that Hirl and Postma did not have access to or knowledge of the SPDs.

D.        Cancellation of Retiree Dental Benefits

For a number of years after the formation of NSTAR, the company maintained separate retiree health plans for retirees of COM/Energy and Boston Edison. The company decided to consolidate these plans on April 1, 2003, and in so doing, to make a number of changes to retiree health benefits, including terminating dental plan coverage for certain retirees and ceasing reimbursement of Medicare Part B premiums for all retirees.

In late 2002, the company notified the plaintiffs and other retirees (including non-union retirees) that if they had not reached age 65 by April 1, 2003, their company-provided dental benefits would cease as soon as they reached age 65; retirees who had reached age 65 by that date would continue to receive dental benefits for life. The plaintiffs here were not age 65 as of April 1, 2003. Plaintiffs Fahy and Phipps lost their dental benefits after turning 65, and Hirl and Postma expect to lose their dental benefits as soon as they turn 65. The letter also stated that

-19-

Medicare Part B reimbursements would stop for all retirees on April 1, 2003.

The company says the changes to retiree benefit plans were needed to save money on retirement benefits, normalize the benefits among retirees of Boston Edison and COM/Energy, and align retiree medical plans with those offered to current employees; Boston Edison retirees never received post-65 dental benefits, while Commonwealth Gas retirees did. The company also notes that some of the changes provided additional benefits to retirees. Present employees who retire will not receive post-65 dental benefits.

## II.

After the company announced its changes to retiree health and dental plan coverage, the plaintiffs filed suit challenging the termination of dental coverage and Medicare Part B reimbursement. The complaint alleged violations of § 502(a)(1)(B) of ERISA, which provides a remedy for an improper denial of benefits, 29 U.S.C. § 1132(a)(1)(B), and of § 301 of the LMRA, which provides a remedy for a "violation of contracts between an employer and a labor organization", id. § 185(a), as well as claims based on theories of breach of fiduciary duty and estoppel under ERISA, and claims under state law.

After discovery, plaintiffs and the company filed cross-motions for summary judgment. On May 31, 2005, the district court

denied the plaintiffs' motion and granted the company's motion on all counts. Senior, 372 F. Supp. 2d at 159. Judgment entered against the plaintiffs. The plaintiffs challenge on appeal the district court's decision only as to their claim that the termination of dental coverage violated § 301 of the LMRA. The Medicare Part B reimbursement issue has dropped from the case.

The district court did not specifically anchor its reasoning as to the claims for dental benefits in the LMRA,[14] although it did reject plaintiffs' reliance on the ERP agreements and the program brochures, stating: "None of these documents . . . make any mention of vesting, and they do not indicate the duration of the dental benefits. As such, they are not sufficient to show that the retirees' dental benefits were vested." Id. at 166 n.7.

The district court found that the only documents with explicit language suggesting a vesting of dental benefits were the individualized benefits summaries given to each of the plaintiffs, which stated that "[y]our dental coverage will be for your life." It also noted that the individualized summaries directed the

---

[14] Indeed, it is unclear whether the district court addressed the plaintiffs' LMRA § 301 claim with respect to dental benefits at all; the court mentioned only the plaintiffs' ERISA claim. The plaintiffs' complaint specifically raises an LMRA claim for termination of dental benefits. In their memorandum in support of summary judgment, the plaintiffs did not explicitly differentiate between the LMRA and ERISA claims regarding termination of dental coverage; however, the plaintiffs did argue that the company had violated the ERP agreements. Moreover, on appeal both plaintiffs and the company treat the district court as having decided the plaintiffs' LMRA § 301 claim.

retiree to consult "actual plan documents"; these documents reserved the right of the company "to amend, modify or terminate the Plan at any time." Id. at 166-67. The court rejected the plaintiffs' argument that this reservation of rights language only gave the company the right to terminate a particular policy with a particular provider, but that coverage was to be perpetual. Id. at 167. It thus "refuse[d] to infer a vesting requirement based on personalized documents that plainly state they are not governing." Id.

## III.

We review the district court's entry of summary judgment de novo, drawing all reasonable inferences in favor of the plaintiffs. We may affirm on any ground supported by the record. See Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19-20 (1st Cir. 2003).

We wish to be clear about what the case is about. This is not an issue of whether some documents in the ERPs stated that there would be lifetime dental benefits. The question is, rather, about whether there is a triable issue of fact that such a statement, when coupled with a reservation by the company of its right to change benefits, in light of the bargaining history and practice, usage and custom here, amounts to a promise by the company never to change the benefits announced.

Interpretation of labor contracts, such as the ERP agreements, under the LMRA is a matter of federal common law. See Fant v. New Eng. Power Serv. Co., 239 F.3d 8, 14 (1st Cir. 2001). The retirees bear the burden of proving that their welfare plan benefits are vested and cannot be changed by the company. See Int'l Ass'n of Machinists & Aerospace Workers v. Masonite Corp., 122 F.3d 228, 231 (5th Cir. 1997); UAW v. Skinner Engine Co., 188 F.3d 130, 138-139 (3d Cir. 1999).

Acting against the background law that welfare plan benefits are generally not vested, Intermodal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co., 520 U.S. 510, 515 (1997), the circuits have taken somewhat different approaches to resolving the question of whether a labor agreement has created vested rights in benefits also covered by ERISA. The district court used the test that unless the labor agreement contained a clear and express statement of vesting, there is no vesting of ERISA benefits. We reject that clear and express statement test, in this situation, as not compelled by federal labor law.[15]

_____

[15] The clear and express statement test came from the very different problem of whether welfare benefits automatically terminate upon the expiration of a labor agreement which is otherwise silent on the issue. See, e.g., Rosetto v. Pabst Brewing Co., 217 F.3d 539 (7th Cir. 2000); Joyce v. Curtiss-Wright Corp., 171 F.3d 130 (2d Cir. 1999); Keffer v. H.K. Porter Co., 872 F.2d 60 (4th Cir. 1989). Further, this case does not involve the issue of whether benefits survive an individual severance agreement. See Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173 (1st Cir. 1995).

A.        Rejection of Use of Presumptions Here

Under the federal law governing the interpretation of a labor contract under the LMRA, a court should resort to traditional principles of contract interpretation to the extent such principles are consistent with federal labor law.  See Textile Workers Union of Am. v. Lincoln Mills, 353 U.S. 448, 456 (1957); see also Yolton v. El Paso Tenn. Pipeline Co., 435 F.3d 571, 580 (6th Cir. 2006); Skinner Engine, 188 F.3d at 138; Masonite, 122 F.3d at 231; United Paperworkers Int'l Union v. Champion Int'l Corp., 908 F.2d 1252, 1256 (5th Cir. 1990).

The parties take exaggerated positions, relying on optimistic readings of cases, to suggest that federal labor law requires us to abandon traditional contract principles and apply a presumption in their favor.  The retirees argue that they are entitled to a presumption in labor agreements for vesting of benefits in their favor; the company argues that there should be a presumption in labor agreements against vesting of benefits.  Neither is correct.

The plaintiffs rely on an old Sixth Circuit decision, UAW v. Yard-Man, 716 F.2d 1476 (6th Cir. 1983), which that circuit has since held does not stand for the proposition that there is a presumption in favor of vesting benefits.[16]  In Yolton, 435 F.3d

_____

[16]  The court in Yard-Man found that retiree welfare benefits had been vested under a CBA.  The court relied, in part, on its understanding that "retiree benefits are in a sense 'status'

-24-

571, the court said: "All that Yard-Man and subsequent cases instruct is that the Court should apply ordinary principles of contract interpretation." Id. at 580.[17]

The company, in turn, overreads Skinner Engine Co., 188 F.3d 130, which involved construction of a CBA that provided for retiree welfare benefits. The court found that the promise of benefits did not extend beyond the term of the CBA. In doing so, it stated that under ERISA, "[b]ecause vesting of welfare plan benefits constitutes an extra-ERISA commitment, an employer's commitment to vest such benefits is not to be inferred lightly and must be stated in clear and explicit language," and that this "cautionary principle[]" applied to the interpretation of collective bargaining agreements as well. Id. at 139. We do not read Skinner Engine to set forth a strict clear and explicit statement rule as suggested by the defendants. The bulk of the

---

benefits which, as such, carry with them an inference that they continue so long as the perquisite status is maintained." 716 F.2d at 1482 (internal citations omitted).

It is doubtful that Yard-Man itself stands for the broad rule that plaintiffs ascribe to it. The "inference" was described as merely a "contextual factor buttress[ing] already sufficient evidence of such intent in the language of the agreement itself." Id. at 1482. The court in Yard-Man relied, in the main, on "traditional rules of contract interpretation" to find that the contract was unambiguous. See id. at 1479-82 (interpreting the language of the contract as a whole, and the "context in which the benefits arose" (emphasis added)).

[17] A number of circuits have criticized Yard-Man, to the extent it can be read as supporting a presumption in favor of vesting. See, e.g., Champion, 908 F.2d at 1261 n.12; Anderson v. Alpha Portland Indus., Inc., 836 F.2d 1512, 1517 (8th Cir. 1988).

-25-

court's opinion in Skinner Engine relied on "traditional rules of contract construction" to determine the meaning of the CBA. Id. at 141 (quoting Yard-Man, 716 F.2d at 1429); see also id. at 138-41 (relying on language and context, and rejecting extrinsic evidence provided by plaintiffs). In addition, the court in Skinner Engine undertook an extended discussion of the plaintiffs' argument that the contract was ambiguous, which likely would have been unnecessary had the court in fact relied on a strict clear and express statement rule. See id. at 144-47.[18]

Our view is that in a claim for benefits based on a labor agreement under the LMRA federal labor law creates no presumption regarding vesting. This is in line with the view of some other circuits. See Rosetto v. Pabst Brewing Co., 217 F.3d 539, 546 (7th

_____

[18] The company also points to a number of circuits that require a clear and express statement of vesting in the purely ERISA context. See, e.g., Sprague v. Gen. Motors Corp., 133 F.3d 388, 400 (6th Cir. 1998) (en banc); Gable v. Sweetheart Cup Co., 35 F.3d 851, 855 (4th Cir. 1994); Wise v. El Paso Nat. Gas Co., 986 F.2d 929, 937 (5th Cir. 1993). The plaintiffs, in reply, point to circuits which have declined to impose such a strict clear and explicit statement of vesting requirement in the ERISA context. See, e.g., Barker v. Ceridian Corp., 122 F.3d 628, 636-37 (8th Cir. 1997).

Not surprisingly, different circuits also have different approaches to the question of whether the same interpretive model should be used in the both the ERISA context and the LMRA context. Compare Rosetto, 217 F.3d at 544 (rejecting requirement of clear and express statement in both the LMRA and ERISA contexts), and Grain Millers, 116 F.3d at 979 (same), with Sprague, 133 F.3d at 400 (requiring clear and express statement of vesting in pure ERISA cases), and Maurer v. Joy Techs., Inc., 212 F.3d 907, 915-16 (6th Cir. 2000) (not requiring express statement of vesting in CBA cases despite en banc decision in Sprague).

Cir. 2000); Grain Millers, 116 F.3d at 980. There are many reasons for our view. It certainly is possible that labor and management could bargain and intend to provide vested retirement welfare benefits that could not be changed as part of an early retirement plan or a voluntary severance plan, and yet fail to put in certain customary words.[19] We fear that the use of presumptions may interfere with the correct interpretation, under normal LMRA rules, of the understanding reached by the parties. Secondly, the use of presumptions may also be inconsistent with the dynamics of bargaining set up under the National Labor Relations Act, 29 U.S.C. §§ 151-169, and the LMRA. Third, Congress could easily have created interpretive presumptions by statute had it cared to do so. The text of the LMRA does not contain any statutory presumptions.

Fourth, though the courts sometimes create judicial interpretive presumptions, there is no reason to craft judicial default rules here. See Bidlack v. Wheelabrator Corp., 993 F.2d 603, 607 (7th Cir. 1993) (en banc). The Supreme Court has crafted only one presumption under the LMRA: the presumption in favor of arbitrability in labor contracts, which applies when a CBA contains an arbitration clause. See Local 285, Serv. Employees Int'l Union v. Nonotuck Res. Assocs. Inc., 64 F.3d 735, 738 (1st Cir. 1995).

---

[19] As the Seventh Circuit has said: "We do not think that a court should refuse to enforce a contract merely because the parties have failed to use a prescribed formula." Bidlack v. Wheelabrator Corp., 993 F.2d 603, 607 (7th Cir. 1993) (en banc).

As the Supreme Court stated in <u>United Steelworkers of America</u> v. <u>Warrior & Gulf Navigation Co.</u>, 363 U.S. 574 (1960), such a presumption is required in order "to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration." <u>Id.</u> at 582; <u>see also</u> <u>AT&T Techs., Inc.</u> v. <u>Commc'ns Workers of Am.</u>, 475 U.S. 643, 650 (1986). We see no similar congressional policy here.

Fifth, in the end, the question will usually be one of the degree of clarity that benefits were or were not unalterably vested, and if vested, under what conditions. There are traditional rules of interpretation of labor agreements which have proven adequate to answer those questions as to non-ERISA benefits, and we do not see why those rules would not work when ERISA benefits are at stake. Those are the rules we use.

B.        <u>Interpretation of the ERP Labor Agreements</u>

Having determined that traditional principles of labor contract interpretation apply to the dispute at issue in this appeal, we turn to those principles to determine whether the ERP agreements provided for vesting benefits that could not be changed by the company.

An unambiguous contract must be enforced according to its terms, under both the common law and labor law. <u>See</u> <u>Grain Millers</u>, 116 F.3d at 980 (holding in LMRA § 301 case that "[a]ll courts agree that if a document unambiguously indicates whether retiree

medical benefits are vested, the unambiguous language should be enforced"); see also Rosetto, 217 F.3d at 542; Yard-Man, 716 F.2d at 1479. The question of whether a contract is ambiguous is generally a question of law for the judge, and is subject to de novo review. See Champion, 908 F.2d at 1256; see also Lohnes v. Level 3 Commc'ns, Inc., 272 F.3d 49, 53 (1st Cir. 2001) (describing this rule as a "bedrock" principle).

We look first to the language of the ERP agreements. Plaintiffs argue that the language in the ERP agreements is unambiguous in creating a vested entitlement to lifetime dental benefits that could not be changed by the company. Defendants argue the ERP agreements clearly express that the company retained its ability to alter benefits. We disagree with both positions.

The language in the ERP agreements stating that at age 62 "the Company will pay the entire premium" does not establish that the parties intended the company to be unconditionally obligated for lifetime dental benefits. The language does not provide a durational term to the retirement benefits. Rather, it defines the level of benefits a retiree may receive at a certain age: the company pays only ten percent of the premium for dental coverage for retirees under 62 years of age, but when the retiree reaches 62, the company pays 100% of the premium. There is no language regarding the duration of the contract.

Since the ERP agreements do not unambiguously answer the question of whether the company bound itself not to ever change the dental benefits granted, we look to the pertinent rules of interpretation. There are several sources. One is a normal rule of contract interpretation, the others are rules about interpreting labor agreements.

Under general principles of contract law, a contract that does not explicitly incorporate another agreement may nonetheless implicitly incorporate that agreement. For instance, Williston states:

> [W]hen the same parties execute two instruments concerning the same subject matter, they may, under some circumstances, be regarded as one contract and construed together whether made simultaneously or on different days, the fact that they were made or dated at different times being insignificant if they are related to and were part of the same transaction.
> . . . .
> Moreover, reference to an extraneous document may be essential to the interpretation and construction of a contract because, even though the writings in question were neither executed on the same day nor made by the same parties, the later writing may so far pertain to the same transaction as the earlier that its meaning at the time and place that it was made can be understood only by reference to the earlier writing.

11 Lord, Williston on Contracts § 30:26 (4th ed.) (footnotes omitted). Corbin similarly notes:

> Internal references in one document to another are often helpful in the processes of interpretation and adjudication, but the

> absence of such a reference does not make a document unusable in these processes or inadmissible in evidence. Its connection and relevancy can be established otherwise.

5 Corbin on Contracts § 24.21.

This principle of general contract law aligns with substantive principles of interpretation of labor agreements, particularly the Supreme Court's instruction that "[i]n order to interpret [a labor] agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and customs pertaining to such agreements." Transp.-Comm'cn Employees Union v. Union Pac. R.R., 385 U.S. 157, 161 (1966). Courts have relied on this principle, in a variety of circumstances, to construe related labor agreements together, even where there is no express incorporation of terms. See Sprague v. Cent. States, Se. & Sw. Areas Pension Fund, 269 F.3d 811, 815-16 (7th Cir. 2001) (interpreting a CBA together with an earlier agreement that had not expressly been incorporated into the CBA, where the parties intended that the plan be considered with the CBA and the CBA would not exist without the earlier agreement (citing Transp.-Commc'n Employees Union, 385 U.S. at 161)); Cent. States, Se. and Sw. Areas Pension Fund v. Kroger Co., 73 F.3d 727, 731 (7th Cir. 1996) ("Every indication surrounding the execution of the CBA points to the conclusion that the Union and Kroger intended the Master Agreement and the Local Supplement to comprise one agreement, and any consideration of the CBA must begin with the

-31-

recognition that it is one contract we are examining -- not two."); Am. Fed. of Labor v. W. Union Tel. Co., 179 F.2d 535, 538 (6th Cir. 1950) (holding that a CBA had implicitly incorporated the specific terms of a separate benefit and pension plan where the CBA stated that the company would not "abandon . . . its existing Benefit and Pension Plan."); see also Murphy v. Keystone Steel & Wire Co., 61 F.3d 560, 567 (7th Cir. 1995) (rejecting an argument, in an ERISA case, that a welfare benefit plan should be read in isolation from a CBA, where the CBA and plan were negotiated together, rested on the same consideration, and the CBA expressly incorporated the plan terms).

It is also important to look at the broader context of a CBA because the "source of law is not confined to the express provisions of the contract, as the industrial common law -- the practices of the industry and the shop -- is equally a part of the collective bargaining agreement although not expressed in it." Warrior & Gulf Navigation Co., 363 U.S. at 581-82; Transp.-Comm'cn Employees Union, 385 U.S. at 161. This rule is not simply a rule about the power of arbitrators. The rule has been recognized and used by courts, including the Supreme Court, as substantive law of labor contract interpretation. See Consol. Rail Corp. v. Ry. Labor Executives Ass'n, 491 U.S. 299, 311-12 (1989). In Consolidated Rail Corp., the Court stated:

> [I]t is well established that the parties' "practice, usage and custom" is of

-32-

significance in interpreting their agreement. This Court has observed: "A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts. . . .[I]t is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate . . . . The collective agreement covers the whole employment relationship. It calls into being a new common law -- the common law of a particular industry or of a particular plant."

Id. (citations omitted) (alteration and omissions in original) (quoting Transp.-Comm'cn Employees Union, 385 U.S. at 160-61); see also Sprague v. Cent. States, Se. & Sw. Areas Pension Fund, 269 F.3d at 815-16 (holding that when interpreting a CBA "a court must consider . . . practices, usage and customs pertaining to [related] agreements" (quoting Transp.-Comm'cn Employees Union, 385 U.S. at 160-61)); Maurer v. Joy Techs., Inc., 212 F.3d 907, 915-16 (6th Cir. 2000) (same); Bidlack, 993 F.2d at 605 (reviewing prior CBAs and prior custom and usage to interpret a later CBA); H.K. Porter Co., 872 F.2d at 62; accord Cherry, 441 F.3d at 483 (relying on "parties' practice" to find that "neither party understood the benefits to be permanent or inalterable").

Whether related agreements are to be construed together under the LMRA depends on the facts and circumstances of the individual case. See 11 Lord, supra, § 30:26 ("To what extent the various provisions in another connected document should be interpreted as part of the writing in question depends on the facts

-33-

and circumstances of each case . . . ."). Here, there are a number of factors that lead us to construe the ERP agreements together with the underlying CBA and the plan documents. The same parties -- the union and the company -- were involved in the formation of the CBA and the ERP agreements. These parties negotiated the ERP agreements against the background understandings they had under the CBA and the plan documents, and there is no evidence that the parties intended the ERP agreements to stand independently of the CBA or the plan documents.

Second, the practice, usage, and custom of the parties make the other CBAs and the plan documents[20] relevant. Retiree dental benefits had been provided for a number of years and entitlement to dental benefits upon retirement was a subject treated variously either under the plan documents alone, or under both the CBA and the plan documents. It would move away from the "practice, usage and custom" of the parties to now read the ERP agreements as standing alone. Third, the terms of the ERP agreements are summary: the agreements are only two pages, refer to "dental insurance coverage" but do not refer to a particular plan, and leave out many details which are only provided in the dental

---

[20] The plaintiffs' claim here, it is important to note, is limited to an LMRA § 301 challenge based solely on the 1997 and 1999 ERP agreements, not the amendment to the 1993 CBA. Plaintiffs do not argue that in the amendment to the 1993 CBA the parties intended that dental benefits would be vested. Indeed, the parties agree that the 1993 amendment only changed eligibility requirements, not the level of benefits.

plan documents, such as the level of reimbursement for various dental health services. Fourth, all other documentary evidence related to the ERPs, including that relied on by the plaintiffs, states that the plan documents "will govern in all cases."

Thus, we look here to related agreements, the practices in the company, and the custom and usage as to retiree dental benefits. The company had long provided retirees -- both union and non-union -- with post-retirement dental benefits. These benefits were not originally provided for under a collectively bargained agreement. Rather, during that time, the relevant terms of retiree dental coverage were provided in the dental plan documents, not the collective bargaining agreements. These dental plan documents, at all times, reserved the right of the company to amend, modify, and terminate plan coverage. Plaintiffs do not claim that, during this time, the company had in fact been providing vested lifetime dental benefits that could not be changed by the company.

In 1993, the union and the company agreed to amend the CBA then in effect, to change only the threshold eligibility requirements for retiree dental benefits. That 1993 CBA did incorporate the dental plan documents. This change to eligibility requirements locked in the date at which employees would be eligible for retiree dental benefits, so that only employees who met the age and length of service requirements as of January 1, 1993 would continue to be eligible for dental benefits (which they

would receive if they also met the "Rule of 75" at retirement). This change reflects the parties' understanding that employees who, by 1993, had served a certain number of years and were of a certain age should continue to eligible for company's preexisting retiree dental benefit program, while other employees would not get such benefits.[21]

It was against this background that the union and the company entered into the CBA governing the years 1996 to 2002. Although that CBA (in effect when the plaintiffs retired) did not itself expressly mention retiree dental benefits, the plaintiffs acknowledged that such benefits continued into the relevant period under the amendment to the 1993 collective bargaining agreement. It is clear under that CBA that no employee, retired or current, had lifetime dental benefits which could not be changed by the company. This was clear at the time the ERP agreements were being negotiated. The effect of the ERPs was to give the employees who retired under them the same dental benefits the other employees had. Plaintiffs argue that the ERP went beyond this position of parity: that the ERP in fact put the ERP retirees in a better position than all other employees and retirees of the company. As we shall see, there is no language anywhere incorporating the plaintiffs' interpretation.

---

[21] All the individual plaintiffs here met the threshold eligibility requirements as of January 1, 1993.

If the intent of the bargain contained in the ERP agreements was to remove the reservation of rights the company had always retained and to advantage plaintiffs over all other employees, one would expect the agreement, or some other relevant document, to say so. As we discuss, the bargaining history shows nothing of the sort.

The ERP agreements contain nothing which purported to change the terms of dental benefits that had been offered to company retirees since 1993 under the CBAs.[22] Indeed, the description of retiree dental benefits in the 1997 and 1999 ERP agreements matches almost exactly the description of those benefits in the 1993 CBA, which, in turn, reserved the company's right to alter the benefits.[23]

We have considered the specific bargaining history of the ERP agreements. The plaintiffs offer no evidence that the issue of the reservation of rights came up at bargaining or that the union

---

[22] This course of dealing casts considerable doubt on plaintiffs' argument that the union would not have entered into these agreements, and that the retirees would not have taken advantage of the ERPs, without the promise of perpetual dental benefits. It also makes clear, as we explain, that in interpreting the terms of the agreement, consideration must be given to the dental plan documents.

[23] The plaintiffs note the reservation of rights language is "subject to the provisions of any collective bargaining agreement." They argue that the company cannot unilaterally "amend, modify, or terminate" the dental plan, but must honor the retirees' bargained-for rights in the ERP agreements. As we explain, under no reasonable reading of the ERP agreements were the retiree dental benefits under the ERPs vested and unchangeable.

and the company understood that the company was giving up the right of termination it had always maintained for dental benefits offered to retirees.  The ERP agreements themselves do not say that retirement dental benefits are <u>not</u> governed by the terms of the plan documents, or that the benefits are not subject to the reservation of rights.  The provision of retiree dental benefits free of the reservation of rights that the company had always maintained on such benefits would have been an important concession by the company.

In the end, the plaintiffs' argument depends not on affirmative evidence of the parties' understanding but on negative inferences they say can be drawn from a series of omissions by the company to repeat at every instance that the company continued to reserve its right to change dental benefits.  From the bargaining history, plaintiffs allege "union negotiators and members were not told that these benefits could be changed by the Company, that they were anything less than lifetime benefits, or that other plan documents, such as summary plan descriptions, could modify or terminate the benefits."  This is disingenuous: at the time of the negotiations it was clear that all dental benefits were subject to a reservation.  If the union wished to change the status quo, it could have bargained to do so.[24]

---

[24] Plaintiffs also negatively infer a guarantee of vested lifetime benefits from the fact that the ERP agreements do not themselves contain express references to the plan documents, which

The plaintiffs also rely on the omission of a discussion of the reservation in two documents, and on oral statements they say company representatives made to them.[25]  The plaintiffs rely on the individualized benefits summaries given to the retirees, which state: "Your dental coverage will be for your life.  Your spouse and/or eligible dependants will be covered for 12 months after your death."[26]  These representations, considered in full, do not create a triable issue for the plaintiffs.  Rather, the summaries specifically refer to the dental plan documents, which contain the reservation of rights language, and say these plan documents are governing.  This reinforces the company's consistent interpretation.  Nor are we able to conclude, in light of these circumstances, that any oral representations to the individual

reserved to the company the right to amend, modify, or terminate the plan.  The argument has two flaws.  The language does not establish that plaintiffs are entitled to what they seek, as we noted.  And we have determined that the ERPs should be interpreted, in accord with custom and usage and normal contract principles, in light of the CBAs and plan documents.

[25] The plaintiffs point to United Steelworkers of Am. v. Textron, Inc., 836 F.2d 6 (1st Cir. 1987), as supporting their position.  It does not.  That case involved review of a grant of a preliminary injunction in favor of retired workers seeking continuation of benefits, and a deferential standard of review. Id. at 8.

[26] Plaintiffs also point to the fact that the version of the VSP program brochure distributed to non-union employees stated "[t]he Company reserves the right to change or terminate coverage for current and former employees at any time," while the version of the program summary given to union employees, including the plaintiffs, did not contain this particular disclaimer. Again, the argument from omission to repeat what is stated elsewhere fails.

plaintiffs could have created a material issue of fact as to what the company and union intended.

The plaintiffs rely on the Seventh Circuit decisions in Bidlack and Rosetto, in which the court held that particular labor agreements were ambiguous as to whether welfare benefits were vested, making summary judgment inappropriate. Those cases do not help the plaintiffs here. Both cases dealt with the very different issue of whether parties to a CBA had agreed that retirement benefits would survive past the expiration of that CBA. See Rosetto, 217 F.3d at 541; Bidlack, 993 F.2d at 606. Here, the ERP agreements have not expired; the question is whether those agreements withdrew the company's long-standing right to alter the dental plan at a time when, under both a contemporaneous CBA and past custom and usage, it was perfectly clear that the company retained such a reservation. Furthermore, the cases are factually distinguishable. In Rosetto, the court relied on the fact that while the plaintiffs' labor agreement did not contain a durational clause, a similar labor agreement between the company and a different union specifically limited retirement benefits to the term of the agreement. Rosetto, 217 F.3d at 545-46. In addition, the company had continued to provide the plaintiffs with the disputed benefits well after the expiration of the agreement. Id. at 546. Ours is the opposite situation: reference to related labor agreements works against the plaintiffs because the reservation was

part of those agreements. Further, here the company has not behaved in a manner that is contrary to its interpretation of the ERP agreements.

Furthermore, in Bidlack there was bargaining history supporting the plaintiffs: a company executive who had participated in negotiations with the union stated that the CBAs "were intended to provide retired employees with vested rights to health benefits." 993 F.2d at 606. The bargaining history here, as described above, does not help the plaintiffs. Finally, in Bidlack there was no discussion of whether the company had reserved its right to alter benefits in any of the documents; here we have such a reservation of rights in the dental plan documents.

In fairness we should mention that the company's position is that at the time of the ERPs, while it did reserve the right to withdraw benefits, it also hoped to provide those who took the program, as well as others, lifetime dental benefits, but found later, given the economics, that it was unable to do so.

IV.

For the reasons stated above, we affirm the grant of summary judgment. The parties shall bear their own costs.